**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

FILED-E04

0? AUG 26 FH 3: 45

U.S. DISTRICT COURT

|  |  |
|---|---|
| BEVERLEY SOODAK, on Behalf of Herself and All Others Similarly Situated, | ) ) ) |
| Plaintiff, | ) ) ) |
| vs. | ) ) ) |
| BAXTER INTERNATIONAL, INC., HARRY M. JANSEN KRAEMER, JR., and BRIAN P. ANDERSON, | ) ) ) ) |
| Defendants. | ) ) ) |

**DOCKETED**
AUG 2 7 2002

No.

JUDGE RONALD GUZMAN

02C 6085

MAGISTRATE JUDGE MASON

**JURY TRIAL DEMANDED**

## CLASS ACTION COMPLAINT
## FOR VIOLATIONS OF FEDERAL SECURITIES LAWS

BEVERLEY SOODAK, on behalf of herself and all others similarly situated, (the "Class"), based upon the investigation of plaintiff's counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by Baxter International, Inc. ("Baxter" or the "Company"); regulatory filings and reports; securities analysts' reports about the Company; press releases and other public statements issued by the Company; and media reports about the Company, alleges as follows. In addition, plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

### SUMMARY OF THE ACTION

1.     Plaintiff brings a class action on behalf of herself and all other purchasers of the securities of Baxter between January 24, 2002 and July 18, 2002, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").



2.     Plaintiff alleges that Baxter and its officers made materially misleading statements and omitted to disclose material adverse information about the Company's financial prospects during the Class Period.  In particular, in addition to other facts, plaintiff alleges that, due to the highly publicized recall of one of the Company's kidney dialysis products, and the subsequent termination of that product, Baxter was in no position to meet its claimed growth targets, and that those growth claims were knowingly or recklessly made without any reasonable basis.

3.     Though not disclosed at the time, the discontinuation of the dialysis product severely hampered Baxter's ability to compete in developing markets where the product was targeted, and left Baxter without a low cost dialyzer product which would preclude the Company's Renal division from ever achieving the growth rates the Company claimed.

4.     When the true condition of the Company was finally revealed on July 18, 2002, Baxter's stock plummeted, losing more than 36% of its value in a single day.

## PARTIES

### Plaintiff

5.     Beverley Soodak, as set forth in the accompanying certification, purchased the securities of Baxter at artificially inflated prices during the Class Period and has suffered damages as a result of the actions alleged herein.

### Defendants

6.     Baxter International Inc. is a Delaware corporation with its principal executive offices located in this District at One Baxter Parkway, Deerfield, Illinois.  Baxter is a worldwide developer, manufacturer and distributor of a diversified line of healthcare-related products, systems and services.

Harry M. Jansen Kraemer, Jr. ("Kraemer") was at all relevant times Baxter's Chief Executive Officer and Chairman of the Board of Directors.

7.     Brian P. Anderson ("Anderson") was at all relevant times Baxter's Chief Financial Officer and Senior Vice President.

8.     Kraemer and Anderson (collectively, the "Individual Defendants" and, with Baxter, "Defendants") were at all relevant times during the Class Period controlling persons of Baxter within the meaning of Section 20(a) of the Exchange Act. By reason of their stock ownership, management positions, and/or membership on Baxter's Board, the Individual Defendants were controlling persons of Baxter and had the power and influence, and exercised the same, to cause it to engage in the illegal conduct complained of herein. The Individual Defendants are liable for the false statements pled herein, as those statements were each "group published" information, the result of the collective action of themselves and officers under their control.

9.     As officers, directors and/or controlling persons of a Company whose common stock is traded on the New York Stock Exchange ("NYSE") and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to disseminate truthful information promptly and accurately with respect to the Company's operations, products, markets, management, earnings and business prospects, to correct any previously issued statements that had become materially misleading or untrue, and to disclose any trends that would materially affect earnings and the financial results of Baxter, so that the market price of the Company's publicly traded securities would be based upon truthful and accurate information.

10.     During the Class Period, each of the Individual Defendants, as senior executive officers of Baxter, was privy to confidential and proprietary information concerning Baxter, its

operations, finances, financial condition, and present and future business prospects. The Individual Defendants had access to material adverse non-public information concerning Baxter via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof, and via reports and other information provided to them in connection with their positions. Because of their possession of such information, the Individual Defendants knew, or recklessly disregarded the fact, that the adverse facts described below had not been disclosed to, and were being concealed from, the investing public.

## JURISDICTION AND VENUE

11.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

12.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

13.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

14.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b). Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District. Additionally, Baxter maintains its chief executive offices and principal place of business within this District.

4

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

15.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased the securities of Baxter between January 24, 2002 to July 18, 2002, inclusive (the "Class Period") and who were damaged thereby.  Excluded from the Class are Defendants, the officers and directors of the Company at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

16.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Baxter had approximately 599 million shares of common stock outstanding, which were actively traded on the NYSE.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds if not thousands of members in the proposed Class who can be identified by records kept by Defendants or their agents.

17.     Plaintiff's claims are typical of the claims of the members of the Class as a whole as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of the securities laws as complained of herein.

18.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

19.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether Defendants' actions violated the federal securities laws;

5

(b)     whether Defendants made statements to the investing public during the Class Period which misrepresented or omitted material facts about the business and operations of Baxter; and

(c)     whether the members of the Class have sustained damages from Defendants' conduct and the proper measure of those damages.

20.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy as joinder of all members of the Class would be impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it unlikely that any individual Class member could obtain a beneficial recovery without a class action.     Plaintiff can foresee no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

### Background Facts

21.     Baxter is a diversified healthcare company that engages in the worldwide development, manufacture and distribution of a diversified line of products, systems and services used primarily in the health care field.  Health care is concerned with the preservation of health and with the diagnosis, cure, mitigation and treatment of disease and body defects and deficiencies.  The Company manufactures products in 28 countries and sells them in over 100 countries.  Its products are used by hospitals, clinical and medical research laboratories, blood and blood dialysis centers, rehabilitation centers, nursing homes, doctors' offices and by patients, at home, under physician supervision.  Most products manufactured or sold by the company are subject to regulation by numerous governmental agencies, both within and outside the United States.

22.     Baxter operates its business via three segments, each of which are strategic businesses that are managed separately. Each of the three businesses develops, manufactures and sells distinct products and services. The segments are: Medication Delivery (medication delivery products and therapies, including intravenous infusion pumps and solutions, anesthesia-delivery devices and pharmaceutical agents, and oncology therapies); BioScience (biopharmaceuticals and blood-collection, separation and storage products and technologies); and Renal (products and services to treat end-stage kidney disease). Baxter claims that its three businesses enjoy leading positions in the medical products and services fields.

23.     Baxter generates nearly fifty (50) percent of its revenues outside the United States. Baxter has claimed that while health care cost containment continues to be a focus around the world, demand for health care products and services continues to be strong worldwide, particularly in developing markets. Thus, the Company's strategies emphasize global expansion and technological innovation to advance medical care worldwide.

24.     Baxter actively engages in research and development programs at research and development centers located around the world and include facilities in Australia, Austria, Belgium, France, Germany, Italy, Japan, Malta, Sweden, the United States and Venezuela.

25.     Baxter maintains twenty-five manufacturing facilities in the United States and its territories, including five in Puerto Rico. The Company also manufactures in Australia, Austria, Belgium, Brazil, Canada, Chile, China, Colombia, Costa Rica, the Dominican Republic, France, Germany, India, Ireland, Italy, Japan, Malta, Mexico, New Zealand, the Philippines, Poland, Singapore, Spain, Switzerland, Tunisia, Turkey and the United Kingdom. The Company also owns

or operates shared distribution facilities throughout the world, including ten in the United States and Puerto Rico and 115 located in thirty-four foreign countries.

26.     In October 2001, six models of dialysis filters manufactured in Baxter's facility at Ronneby, Sweden, were linked to dozens of patient deaths, prompting a recall of all such filters on October 15, 2001. By early November 2001, the number of deaths thought to be linked to Baxter's products had risen to 51.

27.     The incidents received wide media coverage, with articles appearing in major newspapers throughout the nation and abroad, causing the price of Baxter common stock to drop steadily as reports regarding the dialysis-linked deaths surfaced.

28.     On November 5, 2001, Baxter announced that preliminary tests from a subsidiary led Baxter to believe that a processing fluid used in the manufacturing operation in Baxter's Ronneby, Sweden, facility might have played a role the recent hemodialysis patient deaths. Baxter announced in a press release that it expected to take a fourth-quarter after-tax charge of approximately $100-150 million to cover the cost of discontinuing its series A dialyzer product line and other related costs. Baxter reiterated that it would nonetheless meet its 2002 full-year commitments of sales growth in the low-teens, earnings-per-share in the mid-teens and operational cash flow of at least $500 million.

29.     In order to allay investor concerns and to allow insiders to profit from sales of Baxter common stock, Baxter made statements throughout the Class Period highlighting strong revenue and earnings growth and assuring the market that its business, including the Renal division, was growing successfully and that it would meet its financial performance targets for 2002. Baxter represented that growth would be driven by double-digit sales growth in the Medication Delivery and BioScience

8

segments, and with sales growth in the Renal division in the high single-digits (compared with 3% sales growth in 2001).

30.     The foregoing representations were each materially false and misleading because Defendants failed to disclose that demand for products sold by the Renal division had slowed following the deaths in late 2001, the Company was unable to successfully service the low-priced dialyzer market niche previously serviced by the Swedish dialyzers, which had been discontinued, and that the Company was unable to expand the number of dialyzer centers in Latin America. In addition, Defendants failed to disclose that the BioScience division was suffering from serious problems including capacity constraints and a saturated market for certain products, and that the division's sales were not growing sufficiently to allow the Company to meet the revenue and earnings commitments that the Company made throughout the Class Period. The Company's repeated assurances that it was on-track for its 2002 results were knowingly or recklessly made without any reasonable basis in order to forestall a collapse in investor confidence following the dialyzer recall and to allow Baxter insiders to sell their personally-held Baxter common stock at artificially inflated prices.

31.     In addition, Defendants were further motivated to commit the scheme alleged herein because Baxter had entered into an agreement to acquire the stock of Fusion Medical Technologies, Inc. ("Fusion Medical") in a stock-for-stock transaction valued at approximately $157 million. A high stock price would translate into a more favorable exchange ratio for Baxter. Moreover, in order for the merger to be consummated, shareholders of Fusion Medical, who would become Baxter shareholders if the deal closed, had to vote in favor of the merger and Baxter was thus motivated to conceal the true problems with its operations, at least until after the deal was effectuated.

9

32.     As a result of Defendants' misrepresentations and omissions, the price of Baxter's common stock rose steadily throughout the Class Period, allowing Baxter insiders to sell a total of 434,700 shares of Baxter common stock at artificially inflated prices for gross proceeds of more than $23.7 million.  In addition, the artificially inflated stock price allowed Baxter to achieve a favorable exchange ratio for the Fusion Medical acquisition.

33.     On July 18, 2002, Baxter issued a press release announcing the financial  results for its second quarter of 2002, the period ended June 30, 2002.  Contrary to its repeated Class Period representations that it would meet its financial targets, Baxter reported only an 8% increase in sales for the quarter and a decline in net earnings, following the inclusion of two acquisition-related charges.  The disappointing results were attributed to a 1% decline in the Renal segment and sales in its BioScience unit which were materially less than the Company previously assured investors its sales would be.

34.     In response to the announcement, the price of Baxter common stock plummeted on extremely heavy trading volume, falling 36.5% from a $43.41 per share on July 17, 2002, to close at $32 per share on July 18.

35.     Subsequently, on July 29, 2002, *Crain's Chicago Business* reported on the ailing Renal unit's performance.  In relevant part, the article explained that the division was plagued with problems, from the dialyzer fiasco of late 2001 (from which the Company had not recovered) to a weak overseas market for Renal products that stifled the Company's plans to  expand dialysis centers overseas.

## Materially False And Misleading
## Statements Made During The Class Period

36.    On January 24, 2002, the start of the Class Period, Baxter issued a press release announcing its financial results for the fourth quarter and fiscal year ended December 31, 2001. According to the press release, sales for the quarter were up 11%, to $2.14 billion, from the fourth quarter of 2000 while sales of $7.66 billion for the year 2001 also were up 11% over the year 2000 sales. Excluding special charges, earnings for the quarter of $324 million were up 20% over the year-ago period, while earnings for the year 2001 grew 16% to $1.06 billion. The Company attributed the sales growth to increased sales of BioScience products, including Recombinate Antihemophilic Factor, an advanced treatment for hemophilia. The press release stated in pertinent part:

> In 2002, Baxter's BioScience business is projected to grow sales in the mid-teens, driven by increased sales of Recombinate, immune globulins and several vaccines. Baxter is participating in the production of approximately 155 million doses of smallpox vaccine, in conjunction with Acambis Inc. on behalf of the U.S. Department of Health and Human Services.

Baxter's Medication Delivery unit was also expected to grow sales "in the mid-teens in 2002, driven by additions to its drug delivery and infusion systems portfolios and growth in the oncology business." Finally, the press release represented that Baxter's Renal division, was expected "to grow its Renal sales in the high single-digits in 2002, through an increasing number of launches of new peritoneal dialysis and hemiodialysis products, as well as continued growth in its services business." Finally, the press release summarized the Company's expectations for 2002, with Defendant Kraemer stating that the Company would continue to grow in the new year, stating in relevant part the following:

Looking ahead for full-year 2002, Baxter expects to:

Grow sales in the low-teens (at current foreign exchange rates).
Grow earnings-per-share in the mid-teens.
Generate operational cash flow of at least $500 million.

'We are well-positioned to yet again deliver solid growth in 2002, while substantially increasing our investments in a number of growth initiatives, including development of new recombinant proteins, vaccines, drug delivery platforms, oncology, pathogen inactivation and renal products, as well as continued expansion of our BioScience production capacity,' Kraemer added.

37.     Investors and market observers reacted positively to Baxter's release. For example, in a January 24, 2002 article titled "Baxter's Big Quarter Puts it Back on the Radar," one commentator noted that Baxter was going "on my list of companies that I have to think about buying on weakness after seeing its numbers this quarter."

38.     On February 27, 2002, Baxter announced, in a press release, that it had entered into an agreement to acquire Fusion Medical for approximately $157 million. Baxter would use its stock as currency, offering to exchange its shares for shares of Fusion Medical, at a yet-undetermined exchange ratio which called for the payment of $10 of Baxter stock per share of Fusion Medical. According to the press release, Fusion Medical would be part of the BioScience unit, whose addition "expands and enhances [Baxter's] strong portfolio of biotherapeutic solutions for surgery and tissue repair." The deal was subject to the approval of Fusion Medical shareholders and regulatory approval.

39.     On March 13, 2002, Baxter filed its 2001 annual report with the SEC on Form 10-K. The report was signed by Defendant Kraemer. In a section of the report titled "Management's Discussion and Analysis," the Company represented that sales of Renal products in 2001 were driven by sales of products used for peritoneal dialysis, principally in Latin America and Asia. In addition,

according to the report, the economic weakness and volatility in those regions would be offset by, among other things, the growth in demand for dialysis, stating in relevant part the following:

> The remaining sales growth in the Renal Segment was driven principally by continued penetration of products for peritoneal dialysis. The penetration continues to be strongest in emerging markets such as Latin America and Asia, where many people with end-stage renal diseases are currently under-treated. Sales in certain geographic markets continue to be affected by strong pricing pressures and the impact of market consolidation. **These issues are expected to be more than offset by increased penetration of peritoneal dialysis, growth in sales of hemodialysis products, product innovation, continued expansion into developing markets, and additional acquisitions and alliances.** [Emphasis added].

40.     Once again Baxter's release had a positive effect on the market and investors. For example, in a March 14, 2002 article titled "Baxter's Confidence Inspires Conviction," one market observer said the following:

> This time I mean it: I am going to buy Baxter . . . as soon as I am allowed to. This morning on *CNBC's* "Squawk Box," we interviewed Harry Kraemer, the terrific CEO of Baxter, and once again he traced out a story of new products, higher growth and ever-expanding margins. He traced it out with a confidence that made me feel he has the pipeline to make it happen no matter what.

> And it doesn't matter if the economy grows at 3% or shrinks at less than that. Believe me, if the estimates for this company were lower and there was no change for $2.50 next year – I think there is – I wouldn't want to touch the thing. I don't like buying overvalued stocks when there are so many cheap ones out there. But at $2.50 earnings, BAX is just a steal in the $50s.

41.     The statements referenced above in ¶¶ 37 and 40, above, were each materially false and misleading because they failed to disclose and misrepresented the following material adverse facts, among others:

(a)     that Baxter's Renal Division was plagued with numerous problems which were adversely affecting its ability to operate its business such that it was not performing according to the Company's internal forecasts;

13

(b)    that the closure of the Company's Swedish dialyzer operations left it without any low-cost dialysis products thereby exposing it to increased competition. As a result, customers switched to other products causing Baxter to lose sales;

(c)    that Baxter's Renal division was experiencing declining demand for its products, on the heels of the deaths linked to certain of its dialyzers, was suffering declining sales and profits overseas and could not and would not grow its sales in the "high-single-digits" in 2002;

(d)    that the economic instability in certain of the Company's Latin American markets was forcing the Company to delay the expansion of its dialysis centers in the region, thereby causing the Company to experience slowing growth;

(e)    that the market for Albumin-based products, sold by the BioScience division, was over-saturated, resulting in a sharp decline in prices and negatively affecting BioScience's revenues -- especially at its US BioScience business;

(f)    that the BioScience division was suffering from capacity constraints, which caused its sales of IGIV, an intravenous immunoglobulin product, to fall well short of the Company's internal projections;

(g)    that overall demand for Baxter's BioScience products was waning, except for sales of Recombinate -- which was not a sufficiently large portion of the unit's sales to compensate for weakness in the unit's sales of other products -- and the statement that Bioscience's sales will grow in the "mid-teens" was lacking in any reasonable basis when made; and

(h)    as a result of the foregoing Baxter's 2002 earnings projections were lacking in any reasonable basis when made.

14

42.    On April 18, 2002, Baxter issued a press release headlined "Strong First Quarter Positions Baxter Well to Meet Full Year 2002 Commitments." The Company reported that sales for the first quarter of 2002 were $1.95 billion, an 11% increase over the first quarter of 2001, while earnings of $0.41 per share were 17% above last year's first quarter earnings. Defendant Kraemer attributed the results to operational excellence and represented that the growth was sustainable:

> **'Our strong financial performance for the quarter reflects our focus and discipline around operational excellence and our commitment to achieve growth that is sustainable, profitable and capital efficient.** We continue to benefit from the groundwork we've laid with expanded manufacturing capacity, continued successful integration of acquisitions, and advancement of key new technologies like our protein-free recombinant manufacturing, vero-cell vaccine and drug delivery platforms,' said Harry M. Jansen Kraemer, Jr., chairman and chief executive officer. [Emphasis added].

In a section of the press release titled "2002 Financial Commitments," Baxter reiterated its ability to grow sales at a percentage in the low teens, stating in relevant part the following:

> **'We are very excited about the milestones we've achieved in the first quarter, and are on track to achieve those planned for the remainder of the year,'** Kraemer said, adding that the company is well positioned to meet its 2002 financial commitments of sales growth in the low teens, earnings per share growth in the mid-teens and operational cash flow of at least $500 million.

> 'With our focus on accelerating growth -- through new technologies, product launches and strategic partnerships -- we are confident that we will achieve our growth commitments this year, and be positioned well for the long-term with sustainable competitive advantage,' Kraemer stated. [Emphasis added].

43.    The statements referenced above in ¶ 43, were each materially false and misleading for the reasons stated in ¶ 42. In addition, the statements referenced in ¶ 43, above, were also materially false and misleading because they failed to disclose and misrepresented the following material adverse facts, among others:

(a)     that demand for the Company's Renal and BioScience products had slowed and were expected to continue to slow for the remainder of 2002; and

(b)     as a result of the foregoing, Defendants' reaffirmation of its ability to grow its sales in the mid-teens during 2002 and that its growth was "sustainable" were lacking in any reasonable basis when made.

44.     A couple of weeks after the release of the seemingly impressive first quarter financial results, on April 30, 2002, the Company announced that the exchange ratio for the Fusion Medical acquisition had been set at 0.1763 Baxter shares for each share of Fusion Medical. At the time, Baxter's common stock was trading at $56.90 per share, only slightly lower than the Class Period high of $59.60 per share reached on March 27. Fusion Medical shareholder approval was obtained for the acquisition shortly thereafter and the deal closed on May 3.

### The Truth Emerges

45.     On July 18, 2002, Baxter reported disappointing sales growth and massive impairment charges leading to a decline in earnings for the second quarter of 2002. Sales in the quarter rose only 8%, to $2.02 billion. Sales of BioScience products grew 7%, rather than the "mid-teens", while the Renal unit experienced a decline of 1%, instead of the "high-single-digit" growth promised by the Company on April 18. Baxter's net earnings of $253 million, or $0.42 per share, declined by 21% from the first quarter of 2001 after the Company recorded a $51 million charge for in-process research and development of its second quarter acquisition of Fusion Medical and a $70 million impairment charge reflecting a decline in the value of certain of the Company's investments.

46.     In response to the announcement, the price of Baxter common stock fell from $43.41 per share on July 17, 2002, to close at $32 per share on July 18 – a decline of more than 36%.

16

47.     On July 29, 2002, *Crain's Chicago Business*, reported that Baxter's Renal division had not yet been able to replace the dialyzers which were linked to patient deaths with comparable substitutes, stating in relevant part the following:

> The renal division accounted for roughly one-quarter of the Deerfield-based medical products supplier's sales in 2001. It has suffered a series of setbacks, from defective dialysis filters that had to be pulled from the market to tumult in overseas markets that has hammered profit margins.
>
> Unit backslides.
>
> While the company's medication delivery and bioscience units grew 15% and 7%, respectively, in the second quarter, the renal division's sales slipped 1% from the year-earlier period, to $473 million. **That's a far cry from the double-digit growth rate the company was predicting for the unit, and still believes is possible.**
>
> One problem was that Baxter had to pull filters made by Althin Medical AB, a Swedish company that Baxter acquired in March 2000, and shut down its manufacturing facilities after the filters were implicated in the deaths of more than 50 people worldwide last fall. The company did not have an inexpensive substitute for the Althin products, and customers switched to competitive products. To offset the lost sales, Baxter must improve its portfolio of less expensive products like the filters. [Emphasis added].

In addition to decreased sales, the Company was unable to expand dialysis centers overseas, while unfavorable economic conditions, present throughout late 2001 and 2002 (factors which the Company stated in its annual report would be "more than offset"), eroded the unit's profit margins.

Finally, and most tellingly the article states that Alan Heller, president of the Renal division, acknowledged that Baxter's expectations for the unit were unrealistic, stating that **"Mr. Heller acknowledges that Baxter's expectations for the renal unit were too high, and calls the growth rate 'unacceptable.'"** [Emphasis added]

## Additional Scienter Allegations

48.     As alleged herein, Defendants acted with scienter in that Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Baxter, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Baxter, participated in the fraudulent scheme alleged herein.

49.     The Individual Defendants were motivated to commit the fraud alleged herein so that Baxter could secure a favorable exchange ratio for the Fusion Medical deal and, in addition, so that Company insiders could sell their personally held shares of Baxter common stock at prices higher than if the truth about the Company's business was known. Indeed, during the Class Period, Baxter insiders sold a total of 435,700 Baxter common shares, reaping gross proceeds of $23,736,740, as set forth below.

**John Quick**, Corporate Vice President, Quality and Regulatory.

| Date | No. of Shares | Price/Share | Total Proceeds |
|------|---------------|-------------|----------------|
| 1/28/02 | 200 | $52.78 | $10,556 |
| 1/28/02 | 200 | $52.9 | $10,580 |
| 1/28/02 | 1,100 | $52.79 | $58,069 |
| 1/28/02 | 2,666 | $52.91 | $141,058.06 |
| 1/28/02 | 2,900 | $52.82 | $153,178 |
| 1/28/02 | 8,700 | $52.81 | $459,447 |

18

| Date | No. of Shares | Price/Share | Total Proceeds |
|---|---|---|---|
| 1/28/02 | 42,771 | $52.8 | $2,258,308.8 |
| 1/28/02 | 11,100 | $52.84 | $586,524 |
| 1/28/02 | 20,700 | $52.85 | $1,093,995 |
| 6/5/02 | 2,400 | $52.2 | $125,280 |
| 6/5/02 | 2,500 | $52.47 | $131,175 |
| 6/5/02 | 2,500 | $52.39 | $130,975 |
| 6/5/02 | 2,500 | $52.37 | $130,925 |
| 6/5/02 | 2,500 | $52.34 | $130,850 |
| 6/5/02 | 2,500 | $52.34 | $130,840 |
| 6/5/02 | 2,500 | $52.33 | $130,825 |
| 6/5/02 | 2,500 | $52.28 | $130,700 |
| 6/5/02 | 2,500 | $52.15 | $130,375 |
| 6/5/02 | 2,600 | $52.25 | $135,850 |
| 6/5/02 | 3,000 | $52.4 | $157,200 |
| 6/5/02 | 5,000 | $52.5 | $262,500 |
| 6/5/02 | 5,000 | $52.38 | $261,900 |
| 6/5/02 | 7,000 | $52.3 | $366,100 |
| 6/5/02 | 7,500 | $52.42 | $393,150 |
| 6/5/02 | 10,000 | $52.35 | $523,500 |
| 6/5/02 | 15,000 | $52.45 | $786,750 |
| **TOTAL** | **167,837** | | **$8,700,365.86** |

**Thomas J. Sabatino, Jr.**, Senior VP and General Counsel

| Date | No. of Shares | Price/Share | Total Proceeds |
|---|---|---|---|
| 2/1/02 | 22,450 | $55 | $1,234,750 |

**Timothy B. Anderson**, Senior VP, Corporate Strategy and Development

| Date | No. of Shares | Price/Share | Total Proceeds |
|---|---|---|---|
| 2/1/02 | 16,750 | $55.88 | $935,990 |
| 2/1/02 | 10,533 | $55.89 | $588,689.37 |
| 2/1/02 | 9,250 | $56 | $518,000 |
| 2/1/02 | 7,750 | $55.85 | $432,837.50 |
| 2/1/02 | 7,050 | $55.83 | $393,601.50 |
| 2/1/02 | 5,000 | $55.72 | $278,600 |
| 2/1/02 | 4,750 | $55.84 | $265,240 |
| 2/1/02 | 4,550 | $55.81 | $253,935.50 |
| 2/1/02 | 4,150 | $55.82 | $231,653 |
| 2/1/02 | 2,200 | $55.99 | $123,178 |
| 2/1/02 | 1,300 | $55.8 | $72,540 |
| 2/1/02 | 300 | $55.86 | $16,758 |
| **TOTAL** | **73,583** | | **$4,111,022.87** |

19

**Karen J. May**, Corporate VP, Human Resources

| Date | No. of Shares | Price/Share | Total Proceeds |
|------|---------------|-------------|----------------|
| 2/5/02 | 33,000 | $55.9 | $1,844,700 |
| 2/5/02 | 260 | $55.98 | $14,554.80 |
| **TOTAL** | **33,260** | | **$1,859,254.8** |

**James R. Hurley**, Corporate VP, Integration Management

| Date | No. of Shares | Price/Share | Total Proceeds |
|------|---------------|-------------|----------------|
| 2/5/02 | 10,000 | $55.25 | $552,500 |
| 2/5/02 | 5,000 | $55.75 | $278,750 |
| 2/5/02 | 100 | $55.5 | $5,550 |
| **TOTAL** | **15,100** | | **$836,800** |

**Gregory P. Young**, Corporate VP of Baxter Healthcare Corp.

| Date | No. of Shares | Price/Share | Total Proceeds |
|------|---------------|-------------|----------------|
| 3/1/02 | 6,200 | $55.1 | $341,620 |
| 3/1/02 | 2,988 | $55.12 | $164,698.56 |
| **TOTAL** | **9,188** | | **$506,318.56** |

**Eric A. Beard**, Corporate VP and President, Europe

| Date | No. of Shares | Price/Share | Total Proceeds |
|------|---------------|-------------|----------------|
| 2/25/02 | 9,900 | $55.02 | $544,698 |
| 2/25/02 | 8,100 | $55.09 | $446,229 |
| 2/25/02 | 5,000 | $55.05 | $275,250 |
| 2/25/02 | 3,064 | $55.02 | $168,581.28 |
| 2/25/02 | 2,000 | $55.04 | $110,080 |
| 2/25/02 | 1,900 | $55.11 | $104,709 |
| 2/25/02 | 300 | $55.1 | $16,530 |
| 2/25/02 | 100 | $55.03 | $5,503 |
| 2/25/02 | 100 | $55.14 | $5,514 |
| **TOTAL** | **30,464** | | **$1,677,094.28** |

**Norber G. Reidel**, Corporate VP and Chief Scientific Officer

| Date | No. of Shares | Price/Share | Total Proceeds |
|------|---------------|-------------|----------------|
| 3/15/02 | 74,100 | $57.45 | $4,257,045 |
| 3/15/02 | 318 | $57.52 | $18,291.36 |
| **TOTAL** | **74,418** | | **$4,275,336.36** |

**James M. Gatling**, Corporate VP, Global Manufacturing Operations

| Date | No. of Shares | Price/Share | Total Proceeds |
|------|---------------|-------------|----------------|
| 3/15/02 | 9,400 | $57 | $535,800 |

### Undisclosed Adverse Information

50.    The market for Baxter's common stock was open, well-developed and efficient at all relevant times. As a result of these materially false and misleading statements and failures to disclose, Baxter common stock traded at artificially inflated prices during the Class Period. The artificial inflation continued until July 18, 2002, when Baxter revealed the true state of its business, as detailed above. Plaintiff and other members of the Class purchased or otherwise acquired Baxter's common stock relying upon the integrity of the market price of the Company's common stock and market information relating to Baxter, and have been damaged thereby.

51.    During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Baxter common stock, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading. Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as detailed herein.

52.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false or misleading statements about Baxter's earnings. These material misstatements and omissions created in the market an

unrealistically positive assessment of Baxter and its prospects and operations, thus causing the Company's common stock to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in plaintiff and other members of the Class purchasing the Company's common stock at artificially inflated prices, thus leading to their losses when the illusion was revealed, and the market was able to accurately value the Company.

## APPLICABILITY OF PRESUMPTION OF RELIANCE:
## FRAUD-ON-THE-MARKET DOCTRINE

53.    At all relevant times, the market for Baxter's securities was an efficient market for the following reasons, among others:

(a)   Baxter's stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)   As a regulated issuer, Baxter filed periodic public reports with the SEC and the NYSE;

(c)   Baxter regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)   Baxter was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

54.     As a result of the foregoing, the market for Baxter's securities promptly digested current information regarding Baxter from all publicly available sources and reflected such information in Baxter's stock price. Under these circumstances, all purchasers of Baxter's securities during the Class Period suffered similar injury through their purchase of Baxter's securities at artificially inflated prices and a presumption of reliance applies.

## LOSS CAUSATION

55.     The market for Baxter's securities was open, well-developed and efficient at all relevant times. As a result of these materially false and misleading statements and failures to disclose, Baxter's securities traded at artificially inflated prices during the Class Period. The artificial inflation continued until the time Baxter revealed its financial results on July 18, 2002. Plaintiff and other members of the Class purchased or otherwise acquired Baxter securities relying upon the integrity of the market price of Baxter's securities and market information relating to Baxter, and have been damaged thereby.

56.     During the class period, Defendants materially misled the investing public, thereby inflating the price of Baxter's securities, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading. Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations.

57.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by plaintiff and other members of the Class. As described herein, during the Class Period,

Defendants made or caused to be made a series of materially false or misleading statements about Baxter's business, prospects and operations. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Baxter and its business, prospects and operations, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

## NO SAFE HARBOR

58.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Baxter who knew that those statements were false when made.

## FIRST CLAIM

### Against All Defendants

### Violation Of Section 10(b) Of The Exchange Act
### And Rule 10b-5 Promulgated Thereunder

59.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

60.     During the Class Period, Baxter and the Individual Defendants, and each of them, carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Baxter's securities; and (iii) cause Plaintiff and other members of the Class to purchase Baxter's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

61.     Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Baxter's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

62.     Baxter and the Individual Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged

25

and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of Baxter as specified herein.

63.     These Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Baxter's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Baxter and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Baxter's securities during the Class Period.

64.     The Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Baxter's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' omissions and misstatements of the Company's business, operations and earnings throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

65.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Baxter's securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of Baxter's publicly-traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Baxter securities during the Class Period at artificially high prices and were damaged thereby.

66.     At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known of the true financial condition and business prospects of Baxter, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Baxter securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

67.     By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

68.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and  the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## SECOND CLAIM

### Against the Individual Defendants

### Violation Of Section 20(a) Of The Exchange Act

69.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

70.    Each of the Individual Defendants acted as a controlling person of Baxter within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

71.    In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

72.    As set forth above, Baxter and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position

as a controlling person, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Baxter's and the Individual Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a) Determining that this action is a proper class action, certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

(b) Awarding compensatory damages in favor of plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c) Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d) Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.


Dated: August 21, 2002

         Beverley Soodak, on behalf of herself and all others similarly situated, Plaintiff

    By:

         Marvin A. Miller
         Jennifer Winter Sprengel
         Lori A. Fanning
         **MILLER FAUCHER and CAFFERTY LLP**
         30 North LaSalle Street
         Suite 3200
         Chicago, Illinois 60602
         (312) 782-4880

         Steven J. Toll
         Mark S. Willis
         Joshua S. Devore
         **COHEN, MILSTEIN, HAUSFELD &**
          **TOLL, P.L.L.C.**
         1100 New York Avenue, N.W.
         West Tower, Suite 500
         Washington, D.C. 20005
         (202) 408-4600

         Matthew J. Ide
         **COHEN, MILSTEIN, HAUSFELD &**
          **TOLL, P.L.L.C.**
         999 Third Avenue, Suite 3600
         Seattle, WA 98104
         (206) 521-0080

         ***Attorneys for Plaintiff***

## CERTIFICATION OF PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

I, Beverley Soodak, ("Plaintiff") declare, as to the claims asserted under the federal securities laws, that:

1.    I have reviewed the class action complaint asserting securities claims against Baxter International, Inc, and wish to join as a plaintiff, retaining Cohen, Milstein, Hausfeld & Toll, P.L.L.C. as my counsel.

2.    Plaintiff did not purchase the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action.

3.    Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.    My transactions in Baxter International, Inc. during the Class Period of January 24, 200 and July 18, 2002 were as follows:

| DATE | TRANSACTION | NO. OF SHARES | PRICE PER SHARE |
|------|-------------|---------------|-----------------|
| March 5, 2002 | Purchase | 50 shares | $57.39 |

5.    During the three years prior to the date of this Certificate, Plaintiff has not sought to serve or served as a representative party for a class in the following actions under the federal securities laws except as follows:

6.    Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing true and correct.

Executed this _20_ Day of _August_, 2002.

_Beverley Soodak_
Beverley Soodak

#129180v1 <MANAGE> - Baxter International Carswyd

Civil Cover Sheet

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

FILED-ED4

DOCKE

02 AUG 26  PM 3: 45

AUG 2 7

# Civil Cover Sheet

CLERK
U.S. DISTRICT COURT

This automated JS-44 conforms generally to the manual JS-44 approved by the Judicial Conference of the United States in September 1974. The data is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. The information contained herein neither replaces nor supplements the filing and service of pleadings or other papers as required by law. This form is authorized for use only in the Northern District of Illinois.

**Plaintiff(s):** Beverley Soodak,

County of Residence: Montgomery

Plaintiff's Atty: Miller Faucher and Cafferty LLP
30 North LaSalle Street, Suite 3200
Chicago, Illinois 60602
(312) 782-4880

**Defendant(s):** Baxter International, Inc., et al.

County of Residence:

Defendant's Atty: JUDGE RONALD GUZMAN

02C  6035

II. Basis of Jurisdiction: **3. Federal Question (U.S. not a party)** MAGISTRATE JUDGE MASON

III. Citizenship of Principal
Parties **(Diversity Cases Only)**

Plaintiff:- **N/A**

Defendant:- **N/A**

IV. Origin : **1. Original Proceeding**

V. Nature of Suit: **850 Securities / Commodities / Exchange**

VI. Cause of Action: **15 U.S.C. §§ 78j(b) and 78t(a)**

VII. Requested in Complaint

Class Action: **Yes**

Dollar Demand:

Jury Demand: **Yes**

VIII. This case **IS NOT** a refiling of a previously dismissed case.

Signature:

Date: Aug 26, 2002

If any of this information is incorrect, please go back to the Civil Cover Sheet Input form using the *Back* button in your browser and change it. Once correct, print this form, sign and date it and submit it with your new civil action. **Note: You may need to adjust the font size in your browser display to make the form print properly.**

Revised: 06/28/00

8/26/02

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

In the Matter of

**Beverley Soodak,**

v.

**Baxter International, Inc., et al.,**

DOCKETED

AUG 27 2002

FILED-EO4

02 AUG 26 PM 3: 45

CLERK
U.S. DISTRICT COURT

Case Number:

APPEARANCES ARE HEREBY FILED BY THE UNDERSIGNED AS ATTORNEY(S) FOR:

Beverley Soodak, on behalf of herself and all others similarly situated, Plaintiff

JUDGE RONALD GUZM

02C 6085

| (A) | (B) |
|---|---|
| SIGNATURE *Steven J. Toll /LAF* | SIGNATURE *Marvin A. Miller /LAF* |
| NAME Steven J. Toll | NAME Marvin A. Miller |
| FIRM Cohen, Milstein, Hausfeld & Toll, P.L.L.C. | FIRM Miller Faucher and Cafferty LLP |
| STREET ADDRESS 1100 New York Avenue, N.W., #500 | STREET ADDRESS 30 North LaSalle Street, Suite 3200 |
| CITY/STATE/ZIP Washington, DC 20005 | CITY/STATE/ZIP Chicago, Illinois 60602 |
| TELEPHONE NUMBER (202) 408-4600   FAX NUMBER | TELEPHONE NUMBER (312) 782-4880   FAX NUMBER 782-4485 |
| E-MAIL ADDRESS | E-MAIL ADDRESS mmiller@millerfaucher.com |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) 01916769 |
| MEMBER OF TRIAL BAR?   YES ☐   NO ☑ | MEMBER OF TRIAL BAR?   YES ☑   NO ☐ |
| TRIAL ATTORNEY?   YES ☑   NO ☐ | TRIAL ATTORNEY?   YES ☑   NO ☐ |
| | DESIGNATED AS LOCAL COUNSEL?   YES ☑   NO ☐ |

| (C) | (D) |
|---|---|
| SIGNATURE *Mark S. Willis /LAF* | SIGNATURE *Jennifer W. Sprengel /LAF* |
| NAME Mark S. Willis | NAME Jennifer Winter Sprengel |
| FIRM Same as (A) | FIRM Same as (B) |
| STREET ADDRESS | STREET ADDRESS |
| CITY/STATE/ZIP | CITY/STATE/ZIP |
| TELEPHONE NUMBER   FAX NUMBER | TELEPHONE NUMBER   FAX NUMBER |
| E-MAIL ADDRESS | E-MAIL ADDRESS jsprengel@millerfaucher.com |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) 06204446 |
| MEMBER OF TRIAL BAR?   YES ☐   NO ☑ | MEMBER OF TRIAL BAR?   YES ☐   NO ☑ |
| TRIAL ATTORNEY?   YES ☑   NO ☐ | TRIAL ATTORNEY?   YES ☑   NO ☐ |
| DESIGNATED AS LOCAL COUNSEL?   YES ☐   NO ☑ | DESIGNATED AS LOCAL COUNSEL?   YES ☑   NO ☐ |

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

In the Matter of

**Beverley Soodak,**

v.

**Baxter International, Inc., et al.**

DOCKETED

AUG 27 2002

FILED-ED4

02 AUG 26  PM 3: 45

CLERK
U.S. DISTRICT COURT

Case Number:

APPEARANCES ARE HEREBY FILED BY THE UNDERSIGNED AS ATTORNEY(S) FOR:

Beverley Soodak, on behalf of herself and all others similarly situated, Plaintiff

JUDGE RONALD GUZMAN

02C 6085

MAGISTRATE JUDGE

| (E) | | | (F) | | |
|---|---|---|---|---|---|
| SIGNATURE *Joshua S. Devore /LAF* | | | SIGNATURE *Lori A. Fanning* | | |
| NAME Joshua S. Devore | | | NAME Lori A. Fanning | | |
| FIRM Same as (A) | | | FIRM Same as (B) | | |
| STREET ADDRESS | | | STREET ADDRESS | | |
| CITY/STATE/ZIP | | | CITY/STATE/ZIP | | |
| TELEPHONE NUMBER | | FAX NUMBER | TELEPHONE NUMBER | | FAX NUMBER |
| E-MAIL ADDRESS | | | E-MAIL ADDRESS lfanning@millerfaucher.com | | |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) | | | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) 06271192 | | |
| MEMBER OF TRIAL BAR? | YES ☐ | NO ☑ | MEMBER OF TRIAL BAR? | YES ☐ | NO ☑ |
| TRIAL ATTORNEY? | YES ☑ | NO ☐ | TRIAL ATTORNEY? | YES ☐ | NO ☐ |
| | | | DESIGNATED AS LOCAL COUNSEL? | YES ☑ | NO ☐ |

| (G) | | | (H) | | |
|---|---|---|---|---|---|
| SIGNATURE *Matthew J. Ide /LAF* | | | SIGNATURE | | |
| NAME Matthew J. Ide | | | NAME | | |
| FIRM Cohen, Milstein, Hausfeld & Toll, P.L.L.C. | | | FIRM | | |
| STREET ADDRESS 999 Third Avenue, Suite 3600 | | | STREET ADDRESS | | |
| CITY/STATE/ZIP Seattle, Washington 98104 | | | CITY/STATE/ZIP | | |
| TELEPHONE NUMBER (206) 521-0080 | | FAX NUMBER | TELEPHONE NUMBER | | FAX NUMBER |
| E-MAIL ADDRESS | | | E-MAIL ADDRESS | | |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) | | | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) | | |
| MEMBER OF TRIAL BAR? | YES ☐ | NO ☑ | MEMBER OF TRIAL BAR? | YES ☐ | NO ☐ |
| TRIAL ATTORNEY? | YES ☑ | NO ☐ | TRIAL ATTORNEY? | YES ☐ | NO ☐ |
| DESIGNATED AS LOCAL COUNSEL? | YES ☐ | NO ☑ | DESIGNATED AS LOCAL COUNSEL? | YES ☐ | NO ☐ |